NYC C.L.A.S.H., INC., Plaintiff,

v.

**CITY OF NEW YORK, Thomas R. Frieden, in His Official Capacity as Commissioner of the City of New York Department of Health and Mental Hygiene, Elliot Spitzer, in His Official Capacity as Attorney General of the State of New York, and Antonia C. Novello, in Her Official Capacity as Commissioner of the New York State Department of Health, Defendants.**

**No. 03 CIV.5463(VM).**

United States District Court, S.D. New York.

April 21, 2004.

---

Kevin T. Mulhearn, Kevin T. Mulhearn, P.C., Orangeburg, NY, for Plaintiff.

Ave Maria Brennan, Paul A. Crotty, Corp. Counsel, John P. Gasior, Eliot Spitzer, Attorney General, New York, NY, for Defendant.

## AMENDED DECISION AND ORDER

MARRERO, District Judge.

Plaintiff NYC C.L.A.S.H., Inc. ("CLASH") brings this action to challenge the constitutionality of the smoking restrictions contained in the recently-amended New York State Clean Indoor Air Act and the New York City Smoke Free Air Act. Although CLASH challenges the recent amendments to these statutory provisions that prohibit smoking in most indoor places, it focuses its challenge on the prohibition of smoking in bars and food service establishments. The defendants in this action include the City of New York, and Thomas R. Frieden ("Frieden"), in his official capacity as the Commissioner of the New York City Department of Health and Mental Hygiene (collectively, the "Municipal Defendants"). Also named as defendants are Eliot Spitzer, in his official capacity as the Attorney General of the State of New York, and Antonia C. Novello, in her official capacity as Commissioner of the New York State Department of Health (collectively, the "State Defendants" and, together with the Municipal Defendants, "Defendants").

CLASH seeks a declaratory judgment that amendments to the New York State and New York City laws (the "Smoking Bans") prohibiting smoking in practically all indoor privately-owned premises that are open to the public are invalid as violations of the federal constitutional provisions ensuring freedom of association, assembly, and speech; the right to travel; equal protection; and the right to enter into contracts. CLASH further asserts that the New York State Smoking Ban is unconstitutionally vague. As remedies, CLASH seeks injunctive relief against enforcement of these provisions. Pending before the Court are Defendants' motions to dismiss CLASH's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action upon which relief can be granted. In the alternative, the State Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. CLASH opposes Defendants' motions and cross-moves for summary judgment. For the reasons discussed below, the Court *sua sponte* converts the Municipal Defendants' motion to dismiss into a motion for summary judgment, grants Defendants' motions for summary judgment, and denies CLASH's cross-motion for summary judgment.

## I. INTRODUCTION [1]

### A. THE 2003 AMENDMENTS TO THE CLEAN INDOOR AIR ACT

On March 26, 2003, New York State Governor George Pataki signed into law Chapter 13 of the Laws of 2003 ("Chapter 13"), which amended certain provisions of the Clean Indoor Air Act ("CIAA"). The Chapter 13 amendments prohibit smoking in virtually all indoor places in New York State where people work or socialize. *See* 2003 N.Y. Senate Bill No. S.3292; 2003 N.Y. Assembly Bill No. A.7136, *codified at* N.Y. Pub. Health Law §§ 1399–n *et seq.* As will be discussed in greater detail below, Chapter 13 was passed in response to mounting scientific evidence that links exposure to the airborne smoke that is a by-product of smoking, commonly referred to today as "secondhand smoke" or environmental tobacco smoke ("ETS"),[2] to serious health risks to non-smokers.

The version of the CIAA in effect prior to the enactment of Chapter 13 placed numerous restrictions on where a person could smoke. Among these restrictions was an outright ban on smoking in any portion of the indoor area of many common types of establishments open to the public, including auditoriums; elevators; public means of mass transportation and the ticketing/boarding areas thereof; supermarkets; swimming pools; youth centers; and child care facilities, among others. *See id.* (identifying the amendments to the Clean Indoor Air Act). The prior version of the CIAA permitted smoking in the indoor area of many other types of

---

1. The factual recitation below is derived primarily from the following documents: Amended Complaint, dated Sept. 4, 2003, *NYC C.L.A.S.H., Inc. v. City of New York,* No. 03 Civ. 5463 (S.D.N.Y.) ("Amd. Compl."); Plaintiff's Memorandum of Law in Support of its Cross-motion for Summary Judgment—and in opposition to the respective motions of the Municipal and State Defendants to dismiss the Amended Complaint, dated Jan. 15, 2004 ("Pl. Mem."); Affidavit of Kevin T. Mulhearn in Support of Plaintiff's Cross-motion for Summary Judgment, dated Jan. 16, 2004 (with attached exhibits) ("Mulhearn Aff."); Affidavit of Audrey Silk, dated Jan. 15, 2004 ("Silk Aff."); Plaintiff's Reply Memorandum of Law in Support of its Cross-motion for Summary Judgment—and in opposition to the respective motions of the Municipal and State Defendants to dismiss the Amended Complaint, dated Feb. 27, 2004 ("Pl. Reply"); Affidavit of Linda Stewart, dated Feb. 26, 2004 ("Stewart Aff."); Affidavit of Roger Allen Jenkins, dated Feb. 20, 2004 ("Jenkins Aff."); Memorandum of Law in Support of State Defendants' Motion to Dismiss the Amended Complaint, dated Nov. 21, 2003 ("St. Mem."); Affidavit of John P. Gasior in Support of State Defendants' Motion to Dismiss the Complaint, dated Nov. 21, 2003 (with attached exhibits) ("Gasior Aff."); Affidavit of Assembly Member Alexander B. Grannis, dated Nov. 14, 2003 (with attached exhibits) ("Grannis Aff."); Affidavit of Ursula Bauer, M.P.H., Ph. D., dated Nov. 14, 2003 (with attached exhibits) ("Bauer Aff."); Reply Memorandum of Law in Support of State Defendants' Motion to Dismiss the Complaint and in Opposition to Plaintiff's Cross-motion for Summary Judgment, dated Feb. 13, 2004 ("St. Reply"); Municipal Defendants' Memorandum of Law in Support of Motion to Dismiss the Amended Complaint, dated Nov. 20, 2003 ("Mun. Mem."); Declaration in Support of Municipal Defendants' Motion to Dismiss, dated Nov. 20, 2003 ("Mun. Decl."); Memorandum of Law of Municipal Defendants in Opposition to Plaintiff's Cross-motion for Summary Judgment and in Further Support of their Motion to Dismiss, dated Feb. 6, 2004 ("Mun. Opp."). Except where specifically referenced, no further citation to these sources will be made.

2. ETS is comprised of the smoke emitted by the burning end of a lighted cigarette, known as sidestream smoke, and the smoke exhaled by the smoker, known as mainstream smoke. *See* The Health Consequences of Smoking, A Report of The Surgeon General, United States Department of Health and Human Services (1986) at 7. As used herein, "ETS exposure" means the exposure to ETS by a non-smoking person in proximity to a person who is smoking.

establishments only if the owner designated a separate smoking section. Among the facilities that were permitted to maintain separate indoor smoking sections were food service establishments; all public and private colleges and universities; hospitals; public buildings; theaters; museums; libraries; and retail stores. *See id.* Smoking was specifically permitted in bars under the prior version of the CIAA.

With the enactment of Chapter 13, New York State substantially expanded its restrictions on smoking to include a outright ban in almost every indoor area in the state, including, for the first time, places of employment not open to the public, such as private offices.[3] *See* N.Y. Pub. Health Law §§ 1399–n and 1399–o (Consol.2003). Most relevant for the purposes of the present action, Chapter 13 also amended the CIAA to impose of an outright prohibition on smoking in all areas of bars, including outdoor seating areas. *See id.* §§ 1399–o (2) and 1399–n(1). Chapter 13 also strengthened the CIAA's restrictions on smoking in food service establishments by prohibiting smoking in any indoor area of such an establishment and permitting smoking in an outdoor area only under certain conditions. *See id.* §§ 1399–o and 1399–q(6).

## B. THE 2002 AMENDMENTS TO THE SMOKE FREE AIR ACT

On December 18, 2002, the New York City Council enacted Local Law 47 of 2002 ("Local Law 47"), which, like its State counterpart, amended the existing smoking restrictions contained in the New York City Smoke–Free Air Act ("SFAA"). *See* 2002 N.Y.C. Local Law 47, Council Int. No. 256–A, *codified at* N.Y.C. Admin. Code §§ 17–501 *et seq.* Local Law 47 was also passed in recognition of the scientific evidence linking ETS exposure to adverse health effects.

Under the version of the SFAA in effect prior to the enactment of Local Law 47, smoking was prohibited in many indoor places open to the public, including mass transportation; retail stores; restaurants with an indoor seating capacity of more than 35 patrons; business establishments; libraries; museums; and theaters.[4] *See id.* (identifying the amendments to the Smoke Free Air Act).

Local Law 47 repealed all existing smoking provisions then in effect and enacted a more rigorous set of smoking restrictions that, like Chapter 13, prohibit smoking in virtually all indoor locations in New York City where people work or socialize. *See* N.Y.C. Admin. Code § 17–503. Local Law 47, like Chapter 13, also instituted an outright smoking ban in all indoor portions of restaurants, regardless of seating capacity, and in all areas of bars, subject to very narrow exceptions.[5] *See id.* §§ 17–503(a)(5) and (a)(20).

## C. THE PRESENT ACTION

CLASH[6] asserts four counts in its amended complaint.[7] The first count al-

---

3. The CIAA, as amended, specifically excludes certain locations from the smoking ban, including private homes and residences; private automobiles; hotel/motel rooms; retail tobacco businesses; and, subject to certain restrictions, membership associations. *See* N.Y Pub. Health Law § 1399–q (Consol.2003).

4. Smoking in portions of some of these establishments was permitted under specific conditions. *See* 2002 N.Y.C. Local Law 47, Council Int. No. 256–A.

5. Some of these exceptions have been preempted by the enactment of Chapter 13.

6. CLASH is an acronym for "Citizens Lobbying Against Smoker Harassment." (Silk Aff. at Ex. A.)

7. CLASH amended its initial complaint only to remove certain parties as named defendants.

leges that Chapter 13 is unduly vague in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The second count alleges that the Smoking Bans promulgated under Chapter 13 and Local Law 47 violate certain protections under the First and Fourteenth Amendments, namely, freedom of association and assembly, freedom of speech, and freedom of travel. The third count alleges that the Smoking Bans violate the Equal Protection Clause of the Fourteenth Amendment. Finally, the fourth count alleges that the Smoking Bans violate the Privileges and Immunities Clause of the Fourteenth Amendment by unduly interfering with the right of a smoker to form a contract with the owner of a bar or restaurant.

Pending before this Court are the parties' motions for dismissal and/or summary judgment described above.

## II. *DISCUSSION*

### A. *STANDING*

■ As a threshold matter, the Court first must determine whether CLASH has standing to bring this action. Generally, in order to satisfy the standing requirement under Article III of the United States Constitution, a plaintiff must demonstrate that: (1) he or she has suffered an injury in fact; (2) the injury is traceable to alleged actions of the defendant; and (3) the injury will be redressed by a favorable decision. *See Nike, Inc. v. Kasky,* 539 U.S. 654, 123 S.Ct. 2554, 2560, 156 L.Ed.2d 580 (2003) (citation omitted). In a case such as this, where the only plaintiff is an organizational entity that purports to represent a class of people alleged to be aggrieved, the organization must establish that it has standing to bring suit either in its own right or on behalf of its members. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ The State Defendants challenge CLASH's standing on the grounds that CLASH cannot meet the tripartite test for organizational standing discussed by the United States Supreme Court in *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Under *Hunt,* an organization can establish standing on behalf of its members if: (1) its members would otherwise have standing to bring the suit individually; (2) the interests the organization seeks to protect by means of the suit are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members. *See id.* at 342, 97 S.Ct. 2434.

■ The State Defendants argue that CLASH cannot meet the first requirement under *Hunt* because no individual aggrieved member of CLASH is identified. (*See* St. Mem. at 10.) There is, however, no absolute requirement that individual members be identified in order to confer organizational standing. *See, e.g., NAACP v. Button,* 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (finding that the NAACP had standing both in its own right, and to assert the rights of its members although none was named as plaintiff). In a case such as this one, involving a facial challenge to a statute on First Amendment grounds, the prudential limitations of organizational standing are generally relaxed in light of the societal interests that are implicated. *See Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 956–57, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others

not before the court to refrain from constitutionally protected speech or expression."); *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135, 143–45 (2d Cir.2000) (discussing that a facial challenge to a statute on First Amendment grounds is governed by the overbreadth doctrine where prudential standing concerns are relaxed). The requirement that individual members must be able to bring suit on their own behalf is intended to ensure that the organization, through its members, has satisfied the general standing requirements of injury in fact, traceability, and redressability. *See Warth,* 422 U.S. at 511, 95 S.Ct. 2197 ("The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.") (citation omitted). In this case, the Court finds that CLASH, as an organization dedicated to advancing and promoting the interests of smokers who individually would have standing to challenge the Smoking Bans in their own right, has met the first prong of *Hunt* without the need to identify any individual member.

The State Defendants also argue that CLASH has not met the second prong in *Hunt* on the grounds that the relief sought is not germane to CLASH's purpose. In support of this argument, the State Defendants point to CLASH's certificate of incorporation under the New York Business Corporation Law (the "NYBCL"). The certificate states that its purpose is to engage in public relations and any other lawful activity. The State Defendants argue that the amended complaint fails to establish how this stated corporate purpose establishes standing for the relief sought. (*See* St. Mem. at 10–11.)

The Court does not agree. The amended complaint alleges that CLASH is an organization "formed and organized for the purpose of protecting the rights of smokers, ...." (Amd. Compl. at ¶ 7.) Thus, CLASH's self-proclaimed purpose is to promote the interests of smokers and defend smoker's rights. (*See* Silk Aff. at Ex. A.) There is no requirement under the NYBCL that a corporation must be specific in setting forth its purpose in its certificate of incorporation. *See* N.Y. Bus. Corp. Law § 201(a) (Consol.2003) (stating that a corporation may exist for any lawful purpose). Indeed, it is not uncommon for corporations to claim a very broad and generic purpose in their incorporating certificates as a means of preserving the ability to broaden into other types of business ventures without the need to amend the certificate. Accordingly, the Court finds that CLASH's purpose is germane to the interests it seeks to protect, and thus, has met the second prong of *Hunt.*

Finally, the State Defendants argue that the participation of individual members of CLASH in this action is necessary because the amended complaint asserts only constitutional claims. This fact, however, only reinforces the finding that participation of individual CLASH members is not required. *See Warth,* 422 U.S. at 515, 95 S.Ct. 2197 ("If in a proper case, the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). Because the amended complaint seeks only prospective relief and no money damages, the Court discerns no basis upon which the participation of individual CLASH members is required.[8] *See Unit-*

8. While CLASH invokes jurisdiction under 28 U.S.C. § 1343, which provides the basis for

*ed Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 546, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

Accordingly, the Court finds that CLASH has sufficiently demonstrated that it has associational standing to bring this action.

### B. *JUSTICIABILITY*

■ The State Defendants argue that the Court should decline to review CLASH's constitutional challenges to Chapter 13 because CLASH alleges that the statute was "steamrollered into law" and thus, consideration of its claims would ensnare considerations of social policy choices. According to the State Defendants, CLASH's claims constitute a "political question" that the judiciary should avoid deciding under separation of powers principles. (*See* St. Reply at 3–4.)

The State Defendants' argument is without merit. At the outset, the Court notes that federal law explicitly vests this Court with original jurisdiction over this action because CLASH's claims, as alleged, "aris[e] under the constitution . . . ." 28 U.S.C. § 1331. Moreover, while it is true that a federal court should refrain from injecting itself into the political wranglings that sometimes accompany the legislative process, it does not follow that the public policy choices of a legislative body are necessarily beyond judicial concern and scrutiny when such choices are codified. In considering legislative policy choices, the Court's purpose is not to pass upon the wisdom of the enactments, but rather, to determine whether the actions taken infringe upon a constitutionally protected right, and if so, whether, under the appropriate standard of review, the intrusion is justified.

It is precisely in a case such as this one, where a plaintiff alleges that governmental action violates federal constitutional rights, that a federal court has jurisdiction to assess the plaintiff's claim. Were this not the case, judicial review of the constitutionality of legislative acts would often be foreclosed—an outcome that runs counter to our system of checks and balances among the three branches of government. This role of a federal court has long been recognized. *See Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 334–40, 4 L.Ed. 97 (1816). In performing its function for the purposes of the present motion, the Court need not concern itself with whatever collateral political questions may be raised by the enactments of the Smoking Bans. Any such political questions are rightfully left to be answered by New York State and New York City elected officials directly to their constituencies.

Accordingly, the Court rejects the State Defendants' contention that this Court should refrain from considering CLASH's constitutional challenges to Chapter 13 raised herein on the grounds that they raise political questions.

### C. *TREATMENT OF THE PARTIES' MOTIONS*

As an initial procedural matter, the Court must determine the appropriate

the Court's jurisdiction over an action for a civil rights violation brought under 42 U.S.C. § 1983, CLASH also invokes jurisdiction under the federal question statute, 28 U.S.C. § 1331. (*See* Amd. Compl. at ¶ 2.) *See Albany Welfare Rights Org. v. Wyman,* 493 F.2d 1319, 1321 (2d Cir.1974) ("[A] complaint by an association alleging that its members will be harmed by threatened conduct suffices to give the association standing under the general federal question statute, 28 U.S.C. § 1331, . . . ."). Because CLASH seeks declaratory relief, the Court will construe the amended complaint as an action brought under the Declaratory Judgment Act, 28 U.S.C. § 2201.

treatment of the parties' competing motions. Both the State Defendants and the Municipal Defendants have moved to dismiss CLASH's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for the failure to state a claim upon which relief can be granted. The State Defendants have moved in the alternative for summary judgment under Rule 56. CLASH has cross-moved for summary judgment. The Court can thus proceed either under Rule 12(b)(6) and limit itself to consideration of only the amended complaint, exhibits attached thereto, and other documents upon which CLASH relies, *see Chambers v. Time Warner, Inc.* 282 F.3d 147, 152–53 (2d Cir.2002), or *sua sponte* convert the Municipal Defendants' motion to dismiss into a motion for summary judgment and consider all the motions and supporting affidavits under Rule 56.

The Court finds the latter approach preferable in this case, particularly in view of CLASH's own cross-motion for summary judgment, because it will permit consideration of the entire record that the parties have submitted in support of their respective positions. The Court will address the procedural ramifications of this approach in subsection G below.

## D. *STANDARD FOR SUMMARY JUDGMENT*

The Court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must first look to the substantive law of the action to determine which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if the parties dispute material facts, summary judgment will be granted unless the dispute is "genuine," *i.e.*, "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505.

Throughout this inquiry, the Court must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party. *See Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 667 (2d Cir. 1996).

Although in a traditional summary judgment context, the Court must determine whether there are genuine issues of material fact for the factfinder to determine, all of CLASH's claims constitute facial constitutional challenges, and thus, raise only legal issues. *See Myers v. County of Orange*, 157 F.3d 66, 75 n. 3 (2d Cir.1998) ("The issue of whether ... [a municipal] policy has a rational basis and therefore does not violate the Equal Protection Clause, ..., is a legal issue for the court and not a factual issue for jury determination."); *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 227 (2d Cir.1998) (stating that the plaintiff's facial First Amendment challenge "involves a purely legal question"); *United States v. Murphy*, 979 F.2d 287, 289 (2d Cir.1992) ("[T]he constitutionality of a statute is a legal question subject to *de novo* review.") (citation omitted). Thus, the Court can rule as a matter of law on all of CLASH's constitutional claims.

## E. *CONSTITUTIONAL CHALLENGES*

Having established that CLASH has met the standing requirement, and the

appropriate procedural framework upon which to proceed, the Court turns to the merits of CLASH's substantive constitutional challenges to the Smoking Bans.

The first step in assessing the various constitutional bases upon which CLASH seeks to invalidate the Smoking Bans is to establish the appropriate standard of review. CLASH argues fervently that the Court must apply a heightened level of scrutiny to the Smoking Bans because they infringe upon the guarantees of the First and Fourteenth Amendments to the United States Constitution. The Court will determine the appropriate standard of scrutiny in light of the particular constitutional provisions invoked and the nature of rights alleged to be affected.

### 1. First Amendment Claims

CLASH argues that the Smoking Bans impinge upon its members' First Amendment rights. Specifically, CLASH asserts the Smoking Bans interfere with the freedoms of association, assembly, and speech. (See Amd. Compl. at ¶¶ 53–59.) To consider CLASH's contention that the Smoking Bans require a heightened level of review, the Court must necessarily determine whether the Smoking Bans encroach upon any First Amendment protections.

### a. Association and Assembly

■ The United States Supreme Court has explained that the right to associate protected by the First Amendment is implicated in two general instances. First, government intrusion into a person's choice to "enter into and maintain certain intimate human relationships" may violate the right of freedom of association. *Roberts v. United States Jaycees*, 468 U.S. 609,

617–19, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (citing cases). Second, the right to associate freely is implicated when governmental action interferes with an organization engaged in activities protected by the First Amendment, such as speech, assembly, redress of grievances, and the exercise of religion. *See id.* at 618, 104 S.Ct. 3244. Thus, in order for CLASH to succeed in its challenge to the Smoking Bans on the basis of freedom of association, it must demonstrate that the Smoking Bans infringe one of these two general spheres of activities.

CLASH does not suggest that the gathering of individuals in bars and restaurants to engage in social or even business activities while smoking is the type of "intimate" relationships that the Supreme Court contemplated in *Roberts*, nor does CLASH allege that the Smoking Bans unduly interfere with any right of intimacy by smokers in these places.[9] *Cf. City of Dallas v. Stanglin*, 490 U.S. 19, 24, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) ("It is clear beyond cavil that dance-hall patrons, who may number 1,000 on any given night, are not engaged in ... 'intimate human relationships' ...."). Thus, if CLASH's challenge to the Smoking Bans on associational grounds can succeed, it must be grounded in an alleged interference with smokers' ability to assemble and associate with other persons while exercising their First Amendment rights. A fair reading of CLASH's allegations and arguments supports this interpretation of CLASH's theory.

CLASH argues that the Smoking Bans "interfere with ... [CLASH members'] rights ... to associate with other smokers in pursuit of a wide variety of political,

---

9. While such chance encounters may ultimately lead to a more intimate long-term relationship, there is no suggestion that a smoker's inability to smoke interferes with the process in any way. Indeed, for some individuals, it may enhance the possibility of such an outcome.

social, economic, educational, religious, and cultural ends" because for smokers, "smoking is so inherent in the act of socializing and conversing, in relaxing, and in enjoying the comforts of public life, that to bar the act of smoking in all privately owned places that are open to the public deprives smokers of a necessary venue for conducting their private social lives." (Pl. Mem. at 10.) While conceding that the Smoking Bans do not "technically" interfere with the ability to associate and assemble, CLASH posits that because of the Smoking Bans, these rights are "so substantially burdened, so utterly abridged and so encumbered with humiliation as to virtually be voided." (Pl. Reply at 7.) On this basis, CLASH argues that the Court should employ a strict scrutiny standard in this case.

At the outset, the Court notes that CLASH is not entirely clear in identifying the fundamental right that the Smoking Bans allegedly affect. Is it the "right to smoke" as such?[10] The right to assemble, associate, and speak? Or a right to smoke during the course of assembling, associating, and speaking? The Court need not resolve this quandary because it finds that the Smoking Bans do not infringe upon any recognized First Amendment right regardless of the manner in which the perceived right is framed.

A critical flaw inherent in CLASH's First Amendment arguments is the premise that association, speech, and general social interaction cannot occur or cannot be experienced to the fullest without smoking, or, conversely, that unless smokers are allowed to light up on these occasions and at these places, their protected right is somehow fundamentally diminished. Implicit in this premise is that smoking enhances the quality of the social experience and elevates the enjoyment of smokers' First Amendment rights; in other words, that only by being allowed to smoke can smokers contribute fully and enjoy to the maximum the experience of association, assembly, and speech in public places such as bars and restaurants. CLASH's allegation that the Smoking Bans "curtail" certain activities for smokers, in essence suggests that smokers cannot fully engage in conversation and other activities in bars and restaurants unless they are permitted to smoke, or that only by being permitted to smoke in these places can they fully exercise their constitutional rights of association and speech.

Without summarily dismissing all possibility that smoking may contain some scintilla of associational value for some people, there is nothing to say that smoking is a prerequisite to the full exercise of association and speech under the First Amendment. *See Boy Scouts of Am. v. Dale,* 530 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) ("[T]o come within ... [the] ambit [of the right of freedom of association], a group must engage in some form of expression, whether it be public or private."). At best, smoking, where permitted, is but a single component of the entire realm of associational interactions that a bar or restaurant patron could experience. Other aspects include dining, drinking, conversing, viewing or listening to entertainment, and meeting other people. While the Smoking Bans restrict where a person may smoke, it is a far cry to allege that such restrictions unduly interfere with smokers' right to associate freely with whomever they choose in the pursuit of any protected First Amendment activity. *See Fighting Finest, Inc. v. Bratton,* 95

---

**10.** CLASH concedes that it does not allege that there is fundamental right to smoke, per se, (*see* Pl. Reply at 5), although it does allege a "right to smoke" in its amended complaint. (*See* Amd. Compl. at ¶ 54.)

F.3d 224, 228 (2d Cir.1996) (stating that "to be cognizable, the interference with associational rights must be 'direct and substantial' or 'significant'") (quoting *Lyng v. International Union, United Auto., Aerospace and Agric. Implement Workers of Am.*, 485 U.S. 360, 366–67 & n. 5, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988)). Furthermore, CLASH's focus on bars and restaurants ignores the numerous other public places where smokers associate and engage in speech that were already covered by a smoking prohibition long before the enactment of the Smoking Bans.

■ The First Amendment guarantees the fundamental freedoms it enumerates, but not necessarily every purpose or form that exercise of the specific rights may take. Nothing in the Constitution engrafts upon First Amendment protections any other collateral social interaction, whether eating, drinking, dancing, gambling, fighting, or smoking—the list may be endless. While in some circles and events these social enhancements, by custom or practice, may be associated with and perhaps even augment the enjoyment of protected endeavors, it does not follow that they are indispensable conditions to the exercise of particular constitutional rights. The effect of CLASH's "association PLUS" theory would be to embellish the First Amendment with extra-constitutional protection for any ancillary practice adherents may seek to entwine around fundamental freedoms, as a consequence of which the government's power to regulate socially or physically harmful activities may be unduly curtailed.

■ In fact, First Amendment jurisprudence unequivocally rejects CLASH's constitutional enhancement hypothesis. Freedom of association does not extend to gatherings for the purpose of inciting imminent violence or overthrow of government by unlawful means. *See Branden-*

*burg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Likewise, freedom of speech does not protect child pornography. *See New York v. Ferber*, 458 U.S. 747, 764–65, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Freedom of religion does not exempt polygamy or compliance with child labor and immunization laws. *See Cleveland v. United States*, 329 U.S. 14, 19–20, 67 S.Ct. 13, 91 L.Ed. 12 (1946); *Prince v. Massachusetts*, 321 U.S. 158, 166–67, 64 S.Ct. 438, 88 L.Ed. 645 (1944). Nor does freedom of the press protect the prior restraint of the publication of the number and location of military troops during wartime. *See Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). These principles clearly establish that purported ornamentations of First Amendment freedoms warrant no constitutional protection when such activities are not essential to the enjoyment of a particular right, or may otherwise be harmful to public health, safety, order, or general welfare.

■ On this point, the Court finds the Supreme Court's decision in *City of Dallas v. Stanglin*, 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), to be highly persuasive, if not controlling. In *Stanglin*, a city ordinance that restricted admission to certain dance halls to persons between the ages of 14 and 18 was challenged on the grounds that it violated the right of persons in that age group to freely associate with persons in other age groups. *See id.* at 22, 109 S.Ct. 1591. The city's proffered reason for the ordinance was to protect teenagers from the possible corrupting effects of older persons. *See id.* at 21, 109 S.Ct. 1591. Applying a rational basis standard of review, the Supreme Court held that the ordinance did not violate any right of association protected by the First Amendment. *See id.* at 28, 109 S.Ct. 1591. In so holding, the Supreme Court stated

that the Constitution does not recognize a "generalized right of 'social association,'" although it noted that the right does extend to "groups organized to engage in speech that does not pertain directly to politics[,]" such as social, legal, and economic pursuits. *Id.* at 25, 109 S.Ct. 1591.

It bears noting that although the ordinance at issue in *Stanglin* posed a *direct* interference with social interaction, the Supreme Court upheld its validity against a challenge under the right of free association because the group of teenagers affected were not gathering as members of an organized association or for a common purpose protected by the First Amendment. *See id.* at 24–25, 109 S.Ct. 1591. In contrast, the Smoking Bans pose no such direct interference on the social interaction of smokers, who, like the teenagers in *Stanglin,* also do not regularly gather in bars and/or restaurants as an organization of smokers or in pursuit of a common goal or lawful purpose that itself would be protected under the First Amendment. Thus, under the analysis discussed in *Stanglin,* the Smoking Bans would certainly not implicate the right of free association.

Relying on the Second Circuit's decision in *Fighting Finest, Inc. v. Bratton,* 95 F.3d 224 (2d Cir.1996), CLASH seeks to distinguish the instant case from *Stanglin* by arguing that the Smoking Bans impinge upon smokers' association rights in bars and restaurants not only with respect to recreational endeavors, but to business, political, and social endeavors as well. (*See* Pl. Reply at 6.) Whatever generalized non-recreational endeavors are alleged, however, the fact remains that the Smoking Bans do not materially affect any rights protected under the First Amendment. As Defendants correctly point out, under the Smoking Bans, smokers remain free to associate and assemble as they please, to smoke or not, whether it be in a bar, a restaurant, a city street, or any other place where it is otherwise permissible to do so.

Moreover, the decision in *Fighting Finest* serves only to reinforce the Court's finding that the Smoking Bans do not implicate a smoker's right of free association and assembly under the First Amendment. The Second Circuit in *Fighting Finest* found that although the plaintiffs, a boxing team comprised of police officers, enjoyed some constitutionally-protected rights of association, the police commissioner's decision not to permit the team to use the bulletin boards in police precincts was not a material infringement on the organization's ability to freely associate under the First Amendment. *See Fighting Finest,* 95 F.3d at 228 ("[T]he First Amendment does not compel government to facilitate the ease with which an individual may exercise associational rights.") (citation omitted).

For this same reason, CLASH's reliance on *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), is also misplaced. CLASH cites *Coates* in support of its contention that the Smoking Bans are unconstitutional under the First and Fourteenth Amendments because they inhibit association on the mere basis that the group's actions may be annoying. (*See* Pl. Reply at 6.) In *Coates,* the Supreme Court struck down an ordinance that made it illegal for three or more persons to assemble on a public sidewalk and "annoy" people. *See id.* at 615, 91 S.Ct. 1686. No such actual restriction on assembly and association is at issue in this case. While it is true that governmental action need not directly interfere with a person's ability to associate in order to violate First Amendment associational rights, *see Lyng,* 485 U.S. at 367 n. 5, 108 S.Ct. 1184 the Court finds that the Smoking Bans present no material impediment to a smoker's abil-

ity to freely associate and assemble under the First Amendment. Moreover, as will be discussed in greater detail below, the justification for the Smoking Bans reaches far beyond an attempt to restrict merely "annoying" behavior.

Accordingly, the Court concludes that the Smoking Bans do not implicate First Amendment protections with regard to assembly and association and thus, would not merit a heightened level of scrutiny for these claims.

### b. *Speech*

Turning more particularly to CLASH's free speech claim, it is well settled that governmental action that establishes content-based restrictions on the First Amendment right of free speech is presumptively invalid under a strict scrutiny standard of review. *See United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 817, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). On the other hand, content-neutral restrictions on speech are subject to an intermediate level of scrutiny. *See Bartnicki v. Vopper,* 532 U.S. 514, 545, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001). As with CLASH's freedom of association and assembly claims, the determination of the appropriate level of scrutiny to be employed for CLASH's free speech claim will turn on both an examination of the governmental action and a determination as to whether smoking in a bar or restaurant can be a form of protected speech under the First Amendment.

The Court begins by noting that mere conduct, such as smoking, is not generally considered speech, and thus, is not in itself protected under the First Amendment. It is, however, possible for certain conduct to be sufficiently imbued with elements of expression so as to merit constitutional protection. *See Virginia v. Black,* 538 U.S. 343, 123 S.Ct. 1536, 1547,

155 L.Ed.2d 535 (2003); *Church of the Am. Knights of the Ku Klux Klan v. Kerik,* 356 F.3d 197, 205 (2d Cir.2004); *see also Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 708, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (stating that the First Amendment is not implicated when "government is regulating neither speech nor an incidental, nonexpressive effect of speech") (O'Conner, J., concurring).

Thus, conduct that has been found to be sufficiently expressive to merit First Amendment protection has included marching in a parade, *see Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), burning the United States flag, *see United States v. Eichman,* 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990); marching in uniforms bearing the swastika, *see National Socialist Party of Am. v. Skokie,* 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977); defacing and displaying the United States flag upside down and with a peace symbol affixed thereto, *see Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); wearing a jacket with an expletive regarding the military draft, *see Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); wearing an armband to protest a war, *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); and saluting or refusing to salute the flag, *see West Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

The relevant inquiry thus becomes whether, and to what extent, smoking in a public indoor establishment, such as a bar or restaurant, constitutes expressive speech that can be protected under the First Amendment. To this end, the Court must first inquire "whether [a]n intent to convey a particularized message was pres-

ent, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (citing *Spence*, 418 U.S. at 410–11, 94 S.Ct. 2727). The Court is mindful that the Supreme Court in *Hurley* relaxed the requirement articulated in *Spence* that the message be particularized. *See Hurley*, 515 U.S. at 569, 115 S.Ct. 2338. This caveat, however, does not dispense with the requirement that some articulable message must still exist and otherwise "speak" to someone. *See Kerik*, 356 F.3d at 205 n. 6 ("[W]e have interpreted *Hurley* to leave intact the Supreme Court's test for expressive conduct.").

On this issue, CLASH submits a series of "position papers" written by Linda Stewart ("Stewart"). (*See* Mulhearn Aff. at Exs. V–X.) Stewart is proffered as a New York City resident, CLASH member, and as a "noted professional writer and journalist." (*Id.* at ¶ 26.) Stewart's position papers purport to establish that smokers identify themselves, in part, by the act of smoking. Specifically, she asserts that for a smoker, "smoking is indeed part of the person's life and certainly his social life and crucially, more than that, *a part of his identity*." (*Id.* at Ex. V.) (emphasis in original). Thus, according to Stewart, the Smoking Bans "so abridge ... [smokers'] enjoyment of socializing in public as to render both enjoyment and socializing impossible." (*Id.*)

With regard to speech, Stewart submits another position paper that cites numerous writers and journalists to suggest that smoking is a form of political speech, an act of "[r]ebellion against a State and a

state of a[sic] affairs for which smokers feel a righteous rage of revulsion." (*Id.* at Ex. X.) ("Like samizdat, it says we abhor a repressive state, and feel compelled to convey the message."). Stewart likens smoking to flag burning or a statement of racial pride. (*See id.*)

If First Amendment jurisprudence has taught anything, it is that the line between mere conduct and expressive speech is not always clear. Not surprisingly, courts have at times struggled at the fringes of these issues. Nevertheless, the Court is guided by the notion that an almost limitless amount of what a person does everyday can be dubbed to be directly or indirectly expressive, either of one's individuality and creativity, such as the places where a person chooses to socialize, what a person hangs on her walls at home or at her office, or conduct that is expressive of one's support for or opposition to some ideology or cause. Similarly, choices of fashion or even the types of pets or cars that a person chooses to obtain can transmit clear messages about individuality and material values.[11] In this vein, the Court proceeds with caution in considering CLASH's invitation to recognize protectable First Amendment expression in the act of smoking. As the Supreme Court has stated, "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Zalewska v. County of Sullivan*, 316 F.3d

---

**11.** For example, a depiction of James Dean, clad in a leather jacket and leaning against his sports car with a cigarette in hand conjured up, for many old enough to remember, an image of a youthful renegade. In the 1960's and 1970's, tobacco advertisers often would portray smoking as socially acceptable, chic, and as a sign of success. Virginia Slims, for example, often reminded women that smoking was a symbol of sexual appeal, social independence, and success by telling them: "You've Come A Long Way, Baby."

314, 319 (2d Cir.2003). As the Supreme Court has aptly explained:

> It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.

*Stanglin,* 490 U.S. at 25, 109 S.Ct. 1591. Thus, it is the Court's task to draw the line in this case and determine whether a person's choice to smoke in a bar or restaurant rises to the level of protected expressive speech under the First Amendment.

While it is conceivable that, as CLASH suggests, some smokers may light up for the explicit purpose of sending some express or subliminal message, for example, as a rebuke of the Smoking Bans themselves, the Court is not persuaded by the general proposition that a smoker's prevailing motivation for smoking a cigarette, whether it is done in a bar, restaurant, or on a city street, is to convey a message with some profound expressive content to those around him. For, in smoking, like many other commonplace acts, the non-expressive purpose subsumes whatever expressive message may be inferred. Courts that have found protectable expression in conduct have done so because the expressive component was the primary, if not the sole, purpose of the act. Thus, a person who burns the American flag at a political rally, for instance, does so not because of some pyromaniacal urge or to provide warmth while protesting. Rather, the flag burner is driven predominantly by his or her desire to make a statement, to voice an opposition and take a stand on a cause concerning which the flag in flames manifests the relevant sentiments of the actor. Otherwise, the arsonist who coincidentally chooses an American flag to douse in gasoline in order to set a building on fire may rightfully claim that his conduct qualifies for constitutional protection as an expressive act.

The Court recognizes that the image of a burning flag is at an extreme when compared to a smoker in a bar. There is no requirement that a protectable message be as poignant as the burning of the American flag. This example, however, serves to illustrate the point. While Stewart's position paper may give scant credence to the notion that some smokers, under some prearranged conditions, may seek to express a message when they smoke, the Court finds that the opinion of a single CLASH member is unpersuasive to suggest that in every instance the act of smoking in a bar or restaurant is ordinarily so inextricably intermeshed with a message that it always merits First Amendment protection.

Even assuming that smokers generally do intend some message of government defiance or some expression of individuality when they light up a cigarette in a bar or restaurant, the Court wonders whether "the message would be understood by those who reviewed it" to be what CLASH says it is.[12] *Johnson,* 491 U.S. at 404, 109 S.Ct. 2533. In *Zalewska v. County of Sullivan,* 316 F.3d 314 (2d Cir.2003), the Second Circuit rejected a female county employee's free speech challenge to the county's dress code that did not permit her to wear a skirt while working. The

---

12. Stewart also suggests that by the act of smoking together, smokers speak to each other. (*See* Mulhearn Aff. at Ex. X.) ("And it says to another smoker, 'Relax, I'm your friend.'"). Whether smokers share some clandestine language not readily available to non-smokers, however, does not propel the act of smoking within the zone of First Amendment protection.

*Zalewska* Court found that the wearing of a skirt, by itself, was a "vague and unfocused message" that would likely not be understood by those viewing her, and thus, merited little, if any, First Amendment protection. *Id.* at 319–20. Certainly if opposition to the Smoking Bans is the message, then its receipt would be better assured if conveyed in a more appreciable context, such as inside City Hall, Gracie Mansion, or the State Capitol, where it would be so understood and possibly protected. *See id.* at 320 ("Essential to deciding whether an activity carries a perceptible message entitled to protection is an examination of the context in which the activity was conducted.") (citing *Johnson*, 491 U.S. at 405, 109 S.Ct. 2533).

And even assuming that smoking bears some element of detectable expression that would implicate the First Amendment, the government is granted greater leeway to restrict expressive conduct than to restrict the written or spoken word, although it cannot "proscribe particular conduct *because* it has expressive elements." *Johnson* 491 U.S. at 406, 109 S.Ct. 2533 (emphasis in original).

There is nothing to suggest that the Smoking Bans are aimed at the suppression of any expressive conduct. Nor are they aimed at the person as a smoker by reason of his social habit of choice or addiction, as the case may be. Rather, the Smoking Bans are aimed at the act of smoking itself, and only when carried out in certain public places where the state and city legislatures have deemed it to adversely affect other people.[13] In short, the right of free speech, like the rights of assembly and association, is not inherently accompanied by the unrestricted ability to smoke everywhere.

▮ Even further indulging the notion that smoking in a bar or restaurant embodies some shred of expressive conduct protected under the First Amendment, and that the Smoking Bans impose some burden on such expression, the Court finds that the Smoking Bans would pass muster under an intermediate level of scrutiny. The Supreme Court has defined content-neutral restrictions as "those that are *justified* without reference to the content of the regulated speech." *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (internal quotations and citations omitted) (emphasis in original). A content-neutral restriction is one that "does not contravene the fundamental principle that underlies [the] concern about 'content-based' speech regulations: that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" *Id.* at 48–49, 106 S.Ct. 925. (citation omitted).

Because the Smoking Bans are neither specifically targeted at the suppression of the content of any alleged speech nor permit the use of a forum by one group of speakers over another, they would be properly classified as "content-neutral" regulations under this definition. Such regulations are upheld under an intermediate level of scrutiny if they are substantially related to an important governmental interest. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798–99, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

---

**13.** The Smoking Bans also do not attempt to intrude in such places that would be considered to be within a person's sphere of privacy, such as in a private residence, automobile, hotel room, or private social event, and thus, do not ruffle the implied right of privacy in the "penumbras" of the Bill of Rights. *Griswold v. Connecticut*, 381 U.S. 479, 484–85, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

The Court finds that under the more demanding intermediate level of scrutiny, the Smoking Bans would survive CLASH's First Amendment challenge because they are content-neutral, reasonable time, place, and manner restrictions that are substantially related to the important governmental interest of protecting individuals from the harmful effects of ETS. Moreover, the Smoking Bans do not prohibit smoking in such places as city streets, private homes, automobiles, and hotel rooms, and thus, they leave open alternative avenues of expression. *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 n. 3, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002).

Having carefully considered the evidence in the record in a light most favorable to CLASH and after giving CLASH the benefit of all reasonable inferences, the Court is not persuaded that the act of smoking in a bar or restaurant, as proscribed by the Smoking Bans, is sufficiently expressive conduct that would merit protection under the First Amendment. Accordingly, the Court find no basis under CLASH's free speech claim to employ a heightened level of scrutiny.

### 2. *Right To Travel*

CLASH alleges that the Smoking Bans are an unconstitutional infringement on the right to travel as guaranteed under the Fourteenth Amendment. (*See* Amd. Compl. at ¶ 60.) Aside from this conclusory allegation, however, CLASH fails to articulate elsewhere in the amended complaint or in any of its memoranda to the Court, just how this right is implicated. The Court is thus left to consider this claim on the basis of CLASH's general assertion in its amended complaint.

██ The right to travel "is a part of the 'liberty' of which the citizen cannot be deprived without due process of law." *United States v. Laub*, 385 U.S. 475, 481,

87 S.Ct. 574, 17 L.Ed.2d 526 (1967) (citations omitted). As such, it is deemed a fundamental right that is "closely related to [the] rights of free speech and association." *Aptheker v. Secretary of State*, 378 U.S. 500, 517, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964).

██ The Court cannot countenance CLASH's suggestion that the Smoking Bans will deter travel to and within New York State, nor is there anything in the record to support such a contention. Smokers remain free to travel as they please, to no less degree than nonsmokers, and may still smoke while they drive their automobiles or walk in the streets. The Court doubts that the Smoking Bans will play any material role in smokers' travel decisions when considering New York State as a destination, whether it is for a short visit or permanent relocation. In fact, longstanding smoking bans in airplanes, trains, and other means of public transportation—which CLASH does not challenge or even mention—theoretically may affect smokers' travel plans more directly and to a greater degree than their inability to smoke in a bar or restaurant at their New York destination. Because the Court is not persuaded that the Smoking Bans impact smokers' right to travel in any material way, the Court rejects CLASH's right to travel claim.

### 3. *Equal Protection Claim*

CLASH alleges that the Smoking Bans violate the Equal Protection Clause of the Fourteenth Amendment. (*See* Amd. Compl. at ¶¶ 63–66.) Specifically, CLASH argues that the enactment of the Smoking Bans "casts smokers as social lepers by, in effect, classifying smokers as second class citizens." (Pl. Mem. at 11.) On this basis, CLASH argues that the Court's equal protection review compels strict scrutiny, or

in the alternative, an intermediate level of scrutiny. (*See id.* at 11–15.)

To buttress CLASH's equal protection challenge to the Smoking Bans, it submits a position paper written by Stewart that discusses, through vignettes and writers' excerpts, why smokers merit protection as a class under the Equal Protection Clause. (*See* Mulhearn Aff. at Ex. W.) Stewart explains how smokers have been discriminated against by means of hate e-mail CLASH has received and through articles reporting incidents of violence against smokers. (*See id.*) Drawing an analogy to homosexuals, Stewart states that "just because smokers haven't yet (like homosexuals) become a *protected* class, doesn't mean they're not a class for all intents and practical purposes in everyday life." (*Id.*) (emphasis in original). Referring to the Supreme Court's recent decision in *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), Stewart also contends that "criminalizing the *defining conduct* of smokers in all realms of their public lives (a public conduct deeply rooted in both history and tradition and long practiced across the land) both demeans and stigmatizes smokers as a class, and invites discrimination in both public and private spheres." (Mulhearn Aff. at Ex. W.)

The appropriate level of scrutiny to be applied to an equal protection challenge to a statute will necessarily depend upon the type of classification the statute creates. *See Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). Classifications that are based on a suspect class, such as race or national origin, *see Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (holding that a statute that prohibits interracial marriages violates the Equal Protection Clause), or that implicate a recognized fundamental right, *see Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 666–67, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (holding that the right to vote cannot be burdened with the payment of a poll tax), receive strict scrutiny. Such classifications are upheld only if the government can demonstrate that the act is narrowly tailored to further a compelling state interest. *See Grutter v. Bollinger,* 539 U.S. 306, 123 S.Ct. 2325, 2337–38, 156 L.Ed.2d 304 (2003).

On the other hand, governmental actions that establish quasi-suspect classifications, such as those based on gender or illegitimacy, are subjected to an intermediate level of review. *See United States v. Virginia,* 518 U.S. 515, 531–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (gender); *Mills v. Habluetzel,* 456 U.S. 91, 98–99, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982) (illegitimacy). In some instances, classifications that, although not labeled quasi-suspect, implicate an important governmental interest may also trigger intermediate scrutiny. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (extending intermediate scrutiny to a statute that prevented undocumented children from attending school). Laws that fall into this category are upheld if the government demonstrates that the action is "substantially related to an important governmental objective." *Clark,* 486 U.S. at 461, 108 S.Ct. 1910.

Thus, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (citations omitted); *see also Center*

*for Reprod. Law and Policy v. Bush*, 304 F.3d 183, 197 (2d Cir.2002).

■ After considering the evidence in the record in a light most favorable to CLASH, the Court is not persuaded that a heightened level of scrutiny would be appropriate to the equal protection challenge at issue here. Anti-smoking laws have never been recognized as creating a suspect or quasi-suspect classification. This is not surprising when considering that smokers as a class lack the typical characteristics that traditionally have triggered heightened scrutiny when the governmental action targets a group, characteristics such as an immutable trait, the lack of political power, and a "history of purposeful unequal treatment." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439–43, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (considering factors for suspect and quasi-suspect classifications in the context of mental retardation) (citations omitted); *Parham v. Hughes*, 441 U.S. 347, 351, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979) (discussing how governmental actions that create classifications based on immutable traits are often scrutinized more carefully). Smoking, as a discretionary or volitional act, does not merit heightened scrutiny because "[t]he Supreme Court has rejected the notion that a classification is suspect when 'entry into the class ... is the product of voluntary action.'" *United States v. Coleman*, 166 F.3d 428, 431 (2d Cir.1999) (quoting *Plyler*, 457 U.S. at 219 n. 19, 102 S.Ct. 2382).[14] The Court discerns none of the traditional indicators of a suspect or quasi-suspect classification in smokers to a

sufficient degree that would warrant the use of a heightened level of scrutiny in this case. Nor do the Smoking Bans interfere with any fundamental right or any important governmental interest. To the contrary, as discussed in greater detail below, the Smoking Bans serve to protect an important governmental interest—the health and welfare of persons exposed to ETS in New York State.

■ While it is true that the Smoking Bans do single out a particular class of persons and place some greater burdens on their activities, this circumstance alone is insufficient to render the governmental action violative of the Equal Protection Clause. As the Supreme Court stated over 130 years ago, "persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the State." *Slaughter–House Cases*, 83 U.S. (16 Wall.) 36, 62, 21 L.Ed. 394 (1872). In particular, clean air and other environmental controls always place burdens on some groups more than others. For example, compliance with a host of state automobile exhaust emission laws, some rather stringent, undoubtedly increases the cost of manufacturing and selling automobiles—a cost ultimately borne by motorists. On the basis of CLASH's equal protection arguments, an organization such as the Automobile Association of America could argue for the repeal of these laws on the grounds that they deliberately discourage driving and unequally burden motorists as a class. Such an argument, however, would fail for the same reasons applicable to this case,

14. To the extent that some individuals may smoke under the influence of a nicotine addiction, this circumstance would not alter the analysis herein. In instances of addiction, the act of smoking results from a medical condition, which in some cases is treatable, and thus, would not inherently be a part of a person's individuality that would merit First

Amendment protection. The Court notes that there is a whole industry dedicated to assisting smokers to become non-smokers. *See generally,* Joseph A. Page, *Federal Regulation of Tobacco Products and Products That Treat Tobacco Dependence: Are the Playing Fields Level?,* 53 Food Drug L.J. 11, 14–15 (1998) (discussing smoking cessation programs).

namely, that a governmental action that does not implicate a fundamental right or a protected class survives an equal protection challenge if the government articulates some rational basis for the action.

The Court finds unpersuasive CLASH's attempt to analogize smokers to homosexuals. The act of smoking is entirely unrelated to any condition of human being, it is simply not on the same elemental plateau as a person's sexual orientation in defining, in existential terms, who the individual is.[15] Whereas smoking is a human endeavor, one of many a person may do (and one which many are trying to cease doing), homosexuality cannot be equated to just an activity, no more so than a person's race may be called a "thing" on the basis of which the individual's dignity and humanity may be stripped. By the same token, as recognized by numerous laws—including those in New York City and State—banning discrimination on the basis of sexual orientation, homosexuality constitutes a more deeply-rooted aspect of a person's total collage of traits that defines the individual. Thus, the Court finds Stewart's analogy to be inapposite.

For this reason, CLASH's reliance on *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), during oral argument is misplaced. In *Romer*, the Supreme Court struck down an amendment to the Colorado State Constitution that prohibited the enactment or adoption of any law, regulation, ordinance, or policy that protected homosexuals as a class. *See id.* at 624, 632–33, 116 S.Ct. 1620. The *Romer* Court found that the state's attempt to deny a particular group any and all protections under the law violated the Equal Protection Clause. *See id.* at 631–32, 116 S.Ct. 1620. In contrast, the Smoking Bans do not embody a sweeping governmental denial of protection under the law that is specifically intended to burden a particular group, like the amendment at issue in *Romer*. Furthermore, as discussed above, a comparison between homosexuals and smokers is simply not appropriate for the purposes of an equal protection analysis. Finally, to the extent that CLASH seeks a heightened level of review by analogizing smokers to homosexuals, *Romer* offers no support because the Supreme Court invalidated the Colorado amendment on rational basis grounds. *See id.* at 632–33, 116 S.Ct. 1620.

CLASH also places heavy reliance on the Second Circuit's decision in *Ramos v. Town of Vernon*, 353 F.3d 171 (2d Cir. 2003), to forge its position that at the very minimum, the Court should employ an intermediate level of scrutiny in assessing CLASH's equal protection claim. (*See* Pl. Reply at 2–5.) In *Ramos*, two minors and their mother challenged a local curfew ordinance that prohibited any person under the age of 18 to be out on the street between specified hours except under certain circumstances. The *Ramos* Court carefully analyzed the application of all three levels of scrutiny to the curfew and determined that, in light of the balance between the state's interest in protecting minors from their particular vulnerability versus minors' constitutional right to move about freely, an intermediate level of scrutiny was warranted. *See Ramos*, 353 F.3d at 177–81.

The Court finds nothing in *Ramos* that supports the contention that the Smoking Bans must be analyzed under a heightened level of scrutiny. The effect of the restriction on the fundamental right in *Ramos*,

---

**15.** Indeed, the Court may fairly observe that over the past 40 years, overall societal views of smoking have generally moved in an opposite direction from societal views of homosexuality.

like in *Coates,* was direct. In other words, these two cases involved laws that directly proscribed assembly and free movement. The Smoking Bans pose no such direct restriction on movement or assembly. Nor does the Court agree with CLASH that whatever indirect effect the Smoking Bans are alleged to have on the movement or assembly of smokers merits constitutional protection. Thus, *Ramos* offers no support for CLASH's arguments that the Court need apply an intermediate level of scrutiny to the Smoking Bans.

Accordingly, the Court finds no basis to employ either strict scrutiny or an intermediate level of review to CLASH's equal protection challenge to the Smoking Bans.

### 4. *Privileges and Immunities Clause*

■■■ CLASH alleges that the Smoking Bans violate the Privileges and Immunities Clause of the Fourteenth Amendment by impairing the right of smokers to enter into implied contracts with willing bar and restaurant owners to smoke in their establishments. (*See* Amd. Compl. at ¶¶ 68–69.) Because CLASH fails to mention, much less argue, this claim in any of its submissions to the Court, the Court presumes that CLASH has abandoned the claim.[16] The Court will thus give the issue commensurate treatment.

The Court is not persuaded that there is an implied binding and enforceable agreement to smoke between a bar or restaurant owner and a smoker when the smoker enters an establishment, anymore than there is a binding agreement between these parties committing the smoker to purchase alcohol or food. The Court finds that this claim is wholly without merit and is thus rejected.

### 5. *Vagueness*

■■■ CLASH also asserts a facial challenge to Chapter 13 on the grounds that it violates the void-for-vagueness doctrine embodied in the Due Process Clause of the Fourteenth Amendment. (*See* Amd. Compl. at ¶ 40.) Under this doctrine, "a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Roberts v. United States Jaycees,* 468 U.S. 609, 629, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). In other words, "[t]he Due Process Clause requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, and to provide explicit standards for those who apply them." *General Media Communications, Inc. v. Cohen,* 131 F.3d 273, 286 (2d Cir.1997) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). In meeting these requirements, however, "the degree of linguistic precision ... varies with the nature—and in particular, with the consequences of enforcement—of the statutory provision." *Id.* (citation omitted). As CLASH concedes, the standards governing the vagueness doctrine are relaxed when, as here, the challenged laws impose only civil penalties. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Upton v. SEC,* 75 F.3d 92, 98 (2d Cir.1996); *see also Ragin v. New York Times Co.,* 923 F.2d 995, 1002 (2d Cir.1991).

---

**16.** At oral argument, counsel for CLASH made scant mention of this claim.

CLASH's vagueness challenge has two components. First, CLASH argues that the definitions of "bar" and "food service establishment" under Chapter 13 are vague insofar as a patron will be unable to distinguish between them. (*See* Amd. Compl. ¶¶ 41–44.) Second, CLASH argues that this alleged vagueness will lead to arbitrary and discriminatory enforcement of Chapter 13. (*See* id. ¶¶ 45–47.) The Court considers these arguments in turn.

Chapter 13 defines a "bar" as "any area, including outdoor seating areas, devoted to the sale and service of alcoholic beverages for on-premises consumption and where the service of food is only incidental to the consumption of such beverages." N.Y. Pub. Health Law § 1399–n(1). A "food service establishment" is defined as "any area, including outdoor seating areas, or portion thereof in which the business is the sale of food for on-premises consumption." *Id.* at 1399–n(3). While smoking is prohibited in all areas of a bar, a food service establishment may permit smoking in an outdoor area so designated provided that such area: (1) comprises no more than 25 percent of the total outdoor seating area; (2) is at least three feet away from the non-smoking outdoor area; and (3) is designated with appropriate signs. *See id.* § 1399–q(6).

With regard to the first prong of CLASH's vagueness attack, CLASH argues that Chapter 13 "does not set forth any guidance whatsoever as to when or by what criteria an establishment's service of food is to be incidental to the on-premises consumption of alcoholic beverages." (Pl. Mem. at 20.) Thus, according to CLASH,

Chapter 13 "fails to give a person of ordinary intelligence who desires to frequent an establishment with outdoor seating which serves both food and alcohol a reasonable opportunity to know what is prohibited, . . ." (Pl. Mem. at 21.)

This argument has no merit. The legal designation of a particular establishment under Chapter 13 is a matter between the bar or restaurant proprietor and the appropriate county administrative/enforcement agency, and not the smoking patron. When a patron enters an establishment with an outdoor seating area and desires to smoke, the legal classification of the establishment will have been already determined and the appropriate signs displayed, assuming compliance by proprietors. *See* N.Y. Pub. Health Law § 1399–p(1) (requiring the prominent posting of "No Smoking" signs and the like in all areas where smoking is prohibited). Even if signs are not posted, a patron can always inquire if smoking is prohibited, lest there be any doubt. Thus, the Court finds wholly unfounded CLASH's concern that every time an "uncertain patron" who wishes to smoke enters an establishment with an outdoor seating area for the first time, he or she will have to make an on-the-spot determination as to whether the service of food is "incidental to" the service of alcohol using the criteria established by the New York State Department of Health.

In any event, whatever linguistic imprecision exists in Chapter 13 in this regard is minimal, at best, and insufficient as a basis to nullify under the vagueness doctrine a civil statute such as Chapter 13 that is intended to protect public health.[17] *See*

17. The Court notes that a group of bar and restaurant owners raised the same vagueness challenge against Chapter 13 in *Empire State Restaurant and Tavern Association, Inc. v. New York State,* 289 F.Supp.2d 252 (N.D.N.Y.

2003). The Court in that case rejected the vagueness challenge as well on substantially the same grounds discussed herein. *See id.* at 256–57. The vagueness challenge was rejected in that case even though bar and restau-

*United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 578–79, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Local 32B–32J, Serv. Employees Int'l Union v. Port Auth. of N.Y. and N.J.,* 3 F.Supp.2d 413, 419–20 (S.D.N.Y.1998).

The second component of CLASH's vagueness argument asserts that the determination as to whether a premises is a "bar" where the service of food is "incidental" to the service of alcohol will be made on an ad hoc basis, and thereby lead to arbitrary and discriminatory enforcement. (Pl. Mem. at 23.) The Court finds no merit to this argument. As discussed above, the onus is on the proprietor to determine whether a particular establishment qualifies as a "bar" or a "food service establishment" under Chapter 13, not the patrons. Once this determination is made and the appropriate signs are in place, there is no need for any guesswork by patrons or discretion by enforcement officials.[18] The proprietor who permits smoking without making the appropriate determination creates the risk of any inconsistent enforcement.

Accordingly, the Court is not persuaded that Chapter 13 is unconstitutionality vague and thus, rejects CLASH's challenge on this basis.

## F. *RATIONAL BASIS*

Having found no basis upon which to employ a heightened level of scrutiny, the Court proceeds to determine whether the Smoking Bans survive rational basis review.

### 1. *The Rational Basis Test*

Under a rational basis standard of review, government acts carry a "strong presumption of validity." *Beach Communications,* 508 U.S. at 314–15, 113 S.Ct. 2096 (citation omitted); *Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249. Indeed, at its most extreme, rational basis review mandates that a "legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (internal quotations and citations omitted); *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). To uphold the Smoking Bans, then, the Court need only find some "reasonably conceivable state of facts that could provide a rational basis" for their enactment. *Heller,* 509 U.S. at 320, 113 S.Ct. 2637. In other words, the Smoking Bans must "find some footing in the realities of the subject addressed by the legislation." *Id.* at 321, 113 S.Ct. 2637.

### 2. *Evolution of Smoking Research and Regulation*

Because CLASH challenges the bases upon which the Smoking Bans were enacted, it would be beneficial for the Court's analysis to begin with a discussion of the significant historical developments in the evolution of scientific research into the health effects of smoking and the resulting governmental regulations. The purpose of this brief overview is not so much academic, as it serves as a backdrop against which the enactments of the Smoking Bans can be evaluated.

---

rant owners have a greater interest in the precision of these definitions than do patrons.

**18.** Although it is not clear from the amended complaint or CLASH's submissions, the Court presumes that CLASH is concerned here with discriminatory enforcement against smoking patrons and not bar and/or restaurant owners. To the extent CLASH seeks to prevent ad hoc enforcement against owners, it would lack standing to assert those constitutional rights.

Government regulation of smoking in the United States spawned by scientific research linking smoking to detrimental health effects is hardly a recent phenomenon or novel concept. As early as 1964, the United States Surgeon General (the "Surgeon General") first warned the American public of the hazards of smoking tobacco.[19] *See generally* Smoking and Health, Report of the Advisory Committee to the Surgeon General of the Public Health Service, United States Department of Health, Education, and Welfare (1964) (the "1964 Report"). The 1964 Report laid the foundation for further scientific research into the health effects of smoking over the ensuing 40 years; and has led to a legion of federal, state, and local statutory enactments in response to the mounting evidence that smoking is hazardous to a person's health.[20] For example, in 1965, New York State responded to the 1964 Report by enacting a statute to regulate the labeling and advertising of cigarettes. *See* 1965 N.Y. Laws, ch. 470.

Congress also responded that same year by enacting the Federal Cigarette Labeling and Advertising Act (the "1965 Act"). *See* Pub.L. 89–92, 79 Stat. 282 (1965), as amended, 15 U.S.C. §§ 1331 *et seq.* The 1965 Act was the first federal law that required all cigarette packs sold or distributed in the United States to bear a warning label, specifically the statement: "Caution: Cigarette Smoking May Be Hazardous To Your Health." *Id.* 79 Stat. 283. The 1965 Act, however, did not require any such warnings on cigarette advertising.[21] *See id.*

A few years later, Congress amended the 1965 Act by enacting the Public Health Cigarette Smoking Act of 1969 (the "1969 Act"). *See* Pub.L. 91–222, 84 Stat. 87 (1969), as amended, 15 U.S.C. §§ 1331 *et seq.* Most notable among the 1969 Act's amendments was an outright ban on cigarette advertising on television and radio, effective January 1, 1971.[22] *Id.* 84 Stat. 89. Thus, on December 31, 1970, the Marlboro Man rode off into the red desert sunset on television for the last time.

In 1972, the Surgeon General issued a subsequent report on the health effects of smoking. *See generally* The Health Consequences of Smoking, A Report of the Surgeon General: 1972, United States Department of Health, Education, and Wel-

**19.** The first medical reports that discussed the health effects of smoking appeared in the 1920's. *See* Reducing the Health Consequences of Smoking: 25 Years of Progress, A Report of the Surgeon General, United States Department of Health, Education, and Welfare (1989) at 5.

**20.** State regulation of smoking can be traced as far back as the 1800's when some states enacted criminal statutes relating to cigarettes. *See, e.g., Austin v. State,* 101 Tenn. 563, 48 S.W. 305, 309 (1898) (upholding the constitutionality of a criminal statute that banned the sale of cigarettes throughout the state of Tennessee); *State v. Heidenhain,* 7 So. 621, 621–22 (La.1890) (upholding a state criminal ordinance that prohibited smoking on street cars while noting that smoking is "sometimes hurtful to those who are com-

pelled to breathe the atmosphere impregnated with tobacco in close and confined places"); *Commonwealth v. Thompson,* 53 Mass. 231, 232–33 (Mass.1847) (upholding the defendant's conviction under a criminal statute prohibiting smoking on public streets in Boston).

**21.** The 1965 Act explicitly preempted any other legislation relating to the advertising or labeling of cigarettes. *See* Pub.L. 89–92, 79 Stat. 283 (1965).

**22.** The 1969 Act also strengthened the wording of the required warning label on all cigarette packages by replacing the words "may be hazardous to your health" with the words "is dangerous to your health." Pub.L. 91–222, 84 Stat. 88 (1969).

fare (1972) (the "1972 Report").[23] It was in the 1972 Report that the Surgeon General first warned non-smokers that exposure to ETS posed health risks. *See id.* at 128–29.

In 1975, New York State first enacted restrictions on where people could smoke as Article 13–E of the Public Health Law. *See* 1975 N.Y. Laws Ch. 80. The 1975 law prohibited smoking in any means of public transportation, and in certain indoor facilities open to the public, such as libraries, museums, and theaters. *See id.* In a memorandum regarding the 1975 law, New York State Senator John Dunne, one of the sponsors of the bill, discussed its purpose as follows:

> Non-smokers have a right to clean air and should be able to enforce this right. . . . Tobacco smoke represents an immediate physical discomfort for a large number of non-smokers. Additionally, it presents a clear and immediate danger to persons afflicted with emphysema, chronic bronchitis, asthma, various allergies and aggravated heart conditions. For persons so afflicted, they are in many cases denied the opportunity to visit and enjoy public facilities.

1975 N.Y. Legislative Annual at 257. Thus, in 1975, when scientific data on the health effects of ETS was in its relative infancy, the New York anti-smoking law was aimed more at reducing both the health problems of those with pre-existing conditions and the annoyance of ETS to healthy non-smokers.

By 1986, scientific data on the adverse health effects of ETS had continued to mount. That year, the Surgeon General issued a landmark report that, for the first time, provided a serious indictment of ETS as a harmful agent for healthy non-smokers. *See generally* The Health Consequences of Involuntary Smoking, A Report of the Surgeon General, United States Department of Health and Human Services (1986) (the "1986 Report").[24] The 1986 Report, a 359–page comprehensive review of numerous scientific studies establishing a possible correlation between ETS and cancer and other human ailments, concluded that: (1) "[i]nvoluntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers," (2) children of parents who smoke are at greater risk of health problems than children of nonsmokers; and (3) the separation of smokers and nonsmokers in the same airspace may reduce, but not eliminate, exposure to ETS by nonsmokers. *See id.* at 13. According to the then-Assistant Secretary for Health, "[o]n the basis of [the 1986] Report, it is clear that actions to protect nonsmokers from ETS exposure not only are warranted but are essential to protect public health." *Id.* at viii.

---

**23.** The 1972 Report was not made a part of the record by any of the parties. The Court, however, takes judicial notice of it and cites this and other publicly-available government reports solely to illustrate that these reports existed and were a part of the wide body of medical evidence available on the subject of smoking and health that, as a prominent part of the public record, undoubtedly informed the debate. By citing government reports and other publicly-available materials outside the record, the Court does not necessarily give credence to their conclusions or approval of their methodologies, and, as will be evident from the following discussion, the Court acknowledges that there is an opposing body of medical research that challenges some of the findings in these reports and offers contrary conclusions.

**24.** While previous Surgeon General Reports issued in 1979 and 1984 discussed to some extent the data on the relationship between ETS and health, the 1986 Report was the first comprehensive report on this issue.

In 1989, the New York State Legislature enacted the CIAA, which substantially overhauled the state's existing smoking prohibitions. As discussed in subsection A above, the 1989 CIAA placed significant restrictions on smoking in indoor public locations. *See* 1989 N.Y. Laws Ch. 244. Citing the 1986 Report, the Governor's Approval Memorandum regarding the CIAA states that "[t]he case against environmental tobacco smoke has reached compelling proportions" and that the "overwhelming scientific evidence that second-hand smoke poses a grave danger to public health is not subject to serious dispute." 1989 N.Y. Chapter Law Memoranda at 148.

The data against ETS continued to mount in the 1990's. In 1992, the United States Environmental Protection Agency ("EPA") issued a report that examined ETS research to date. The report concluded that ETS was a significant risk factor in the development of lung cancer in nonsmokers. *See* generally Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders, United States Environmental Protection Agency (1992) (the "1992 EPA Report"). The 1992 EPA Report found compelling evidence that ETS is a human carcinogen and approximated that every year 3,000 lung cancer deaths were attributable to exposure to ETS. *See id.* at 1–4. The 1992 EPA Report also found that research suggested a possible connection between ETS and other forms of cancers, cardiovascular disease, and respiratory ailments. *See id.* at 1–4, 1–5.

In 1995, New York City responded to the accumulation of medical and scientific evidence regarding ETS by enacting its own smoking regulations as the SFAA. The New York City Council began deliberations on the SFAA in March 1994 and heard testimony from over 200 witnesses during public hearings related to the passage of these laws. *See Beatie v. City of New York*, 123 F.3d 707, 710 (2d Cir. 1997).[25]

Today, over 40 states have enacted laws restricting smoking in public places and approximately half of all the states have laws restricting smoking in private work locations.[26] When it comes to state prohibition of smoking in the indoor portions of bars and/or restaurants, New York is not alone.[27] Federal regulation of smoking has continued to evolve as well. For example, federal law now prohibits smoking on all domestic commercial flights; and on foreign commercial flights, subject to any objection by the particular foreign government. *See* 49 U.S.C. § 41706. Smoking is also prohibited in most non-chartered motor common carriers transporting passengers in interstate commerce. *See* 49 C.F.R. § 374.201. And in 1997, President Clinton issued an Executive Order prohibiting smoking in all indoor government locations subject to the Executive Branch. *See* Exec. Order No. 13058, 62 Fed.Reg. 43,451, 1997 WL 457789 (Aug. 9, 1997).[28]

**25.** New York State amended the CIAA in 1995 to include air protections in schools and youth facilities. (*See* Grannis Aff. at ¶ 2.)

**26.** *See, e.g.,* Conn. Gen.Stat. Ann. § 19a–342 (West 2003); Nev.Rev.Stat. § 202.2491 (2004); N.M. Stat. Ann. § 24–16–4 (Michie 2003); R.I. Gen. Laws § 23–20.6–2 (2004); S.D. Codified Laws § 22–36–2 (Michie 2003); Vt. Stat. Ann. tit. 18, §§ 1742–44 (2003).

**27.** *See, e.g.,* Cal. Labor Code § 6404.5 (Deering 2004); Del.Code Ann. tit. 16 §§ 2903 & 2904 (2004); Fla. Stat. Ann. § 386.204 & 386.2045 (2003); Me.Rev.Stat. Ann. tit. 22, § 1542 (2003); Utah Code Ann. § 26–38–3 (2003).

**28.** A nationwide smoking ban in almost all indoor public places recently went into effect in Ireland. Similar bans are scheduled to take effect in Norway and the Netherlands. *See* Brian Lavery, *No–Fumes Day*, N.Y. Times,

### 3. *Legislative History of the Smoking Bans*

Defendants have provided evidence with regard to what the New York State Legislature and the New York City Council considered in enacting the Smoking Bans. Most telling is the affidavit of New York State Assembly Member Alexander B. Grannis ("Grannis"), who has been an Assembly Member since 1975 and was the author of the original 1989 CIAA and all its amendments, including Chapter 13. (*See* Grannis Aff. at ¶¶ 1–2.) Grannis attests that he has followed the scientific and medical research detailing the health hazards of ETS. According to Grannis, "the Assembly obtained and reviewed many scientific and medical studies and other publications dealing with the health effects of secondhand smoke." (*Id.* at ¶ 6.) Attached to the Grannis affidavit is a list of 15 documents that Grannis attests that the New York Assembly considered in enacting Chapter 13, among them, the 1986 Report, the 1992 EPA Report, and studies reported in the Journal of the American Medical Association.

The record also includes the affidavit of Ursula Bauer ("Bauer"), the Director of the New York State Department of Health Tobacco Control Program. In Bauer's affidavit, she sets forth in greater detail the methodologies and findings of the materials Grannis cites as having been considered by the New York Assembly during the passage of Chapter 13. (*See* Bauer Aff. at ¶¶ 4–16.)

The New York State Senate issued a memorandum in support of Chapter 13 that states that the justification for the bill is "to protect all workers from exposure to deadly secondhand smoke in all workplaces, including bars and restaurants."

(2003 N.Y. Laws Ch. 13, Leg. Memo. (McKinney).) Shortly after Governor Pataki signed Chapter 13 into law, a spokesperson for the Governor issued the statement that the Governor has "signed the bill because he believes a statewide ban on smoking in the workplace will lead to a healthier New York and will reduce the cost of health care for New Yorkers." James M. Odato, Pataki Signs Ban on Smoking, Times Union, Mar. 27, 2003, *available at* 2003 WL 5008030.

With regard to Local Law 47, the record illustrates that the New York City Council also considered the mounting evidence against ETS as a basis for its enactment. In testimony before the New York City Council Committee on Health a few months prior to the enactment of Local Law 47, Frieden discussed the justification for considering more restrictive smoking regulations:

> You have the opportunity to enact legislation that can ... serve as a national model for worker protection—protection from deadly secondhand smoke that disproportionately affects minority workers, underpaid and working long hours.
>
> Every day, the Health Department registers the deaths of 25 New Yorkers who were killed by tobacco. About one out of every 10 people who die from tobacco die because of other people's smoke.
>
> The evidence that second-hand smoke kills is clear and consistent. The evidence comes from studies of the chemicals in second-hand smoke, from animal studies, and from studies analyzing the health of hundreds of thousands of people. There is no scientific doubt about the matter.

Feb. 29, 2004, at Sec. 5, Page 10. Thus, it appears that concerns over the effects of ETS have taken hold even in smoke-happy Europe, where public smoking has been generally more accepted than in the United States.

Second-hand smoke is an occupational hazard whether you are a waiter or a secretary, a bartender or a banker. African–Americans, Latinos and Latinas, and those with low incomes are twice as likely to have to breathe second-hand smoke on the job.

Owners don't have the right to expose workers to the hazardous chemicals in second-hand smoke. The fundamental principle of worker safety is that workers should not have to choose between their health and their jobs.

(Testimony of Thomas R. Frieden, Mun. Decl. at Ex. E.) As this passage discusses, Local Law 47 was enacted as a measure to further protect New Yorkers in response to the evidence that ETS exposure poses serious health effects.[29]

### 4. *CLASH's Evidence*

CLASH counters with an effort to discredit the juggernaut of scientific ETS evidence that Defendants have submitted in support of the Smoking Bans.[30] Specifically, CLASH submits voluminous amounts of documents, including articles, reports of independent medical research, and other miscellaneous reports that criticize the findings that ETS is harmful. (*See* Mulhearn Aff. at Exs. C–Q; Jenkins Aff. at ¶¶ 8–17.) While some of these documents seek to discredit ETS research in general, a large portion of CLASH's ETS evidence (and CLASH's arguments) is targeted particularly at discrediting the 1992 EPA Report, presumably as a result of Defendants' stated reliance on this report and on its conclusion that ETS is a carcinogen. (*See* Mulhearn Aff. at Exs. C–G, K–L, EE; Stewart Aff. at Ex. B; Pl. Mem. at 16–17.)

Another significant focus of CLASH's assault on the ETS data Defendants rely upon is an attempt to cast doubt on the precise number of fatalities that Defendants cite in support of the Smoking Bans. (*See, e.g.,* Mulhearn Aff. at Exs. T, Z; Stewart Aff. at 2–3, Ex. A.)

Noteworthy among CLASH's submissions is Stewart's position papers and affidavit. In these submissions, Stewart single-handedly attempts to: (1) rebut the scientific ETS findings Defendants rely upon; (2) review contrary scientific findings on ETS; (3) discuss how to properly interpret the reported findings of scientific research; (4) comment on what the legislatures considered when they passed the Smoking Bans; and (5) rebut, paragraph-by-paragraph, the affidavits of Gasior, Grannis, and Bauer, including Grannis' attestations relating to what the lawmakers considered during the enactment of Chapter 13 and the overall legislative process. (*See* Mulhearn Aff. at Exs. Z–AA, CC–JJ, KK; Stewart Aff. at ¶¶ 4–53.)

### 5. *Application*

■ Stewart's analysis may be as impressive as it is ambitious. It is, however, largely besides the point, and thus, the Court need not engage in any substantive assessment of which side presented the more compelling and supportable medical evidence. For, in the final analysis, the test is not whether the scientific materials the legislators relied upon was medically sound or empirically correct, but whether the enactments find some rational basis on some "conceivable state of facts." *Heller*, 509 U.S. at 320, 113 S.Ct. 2637.

Upon careful consideration of all the evidence submitted by the parties in a

---

**29.** Prior to the effective date of Local Law 47, a public hearing was held where testimony and written comments were received and reviewed. (*See* Mun. Decl. at Ex. F.)

**30.** It bears noting that the 15 documents listed in Grannis' affidavit discuss or make reference to other scientific ETS research and studies.

light most favorable to CLASH, the Court finds that the Smoking Bans easily survive this rather expansive standard. New York State's and New York City's stated basis for enacting the Smoking Bans—protecting its citizenry from the well-documented harmful effects of ETS—provides a sufficient rational basis to withstand CLASH's constitutional challenges. *See Hill v. Colorado,* 530 U.S. 703, 715, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) ("It is a traditional exercise of the States' police powers to protect the health and safety of their citizens.") (internal quotations and citation omitted). The record is clear that both the New York State Legislature and the New York City Council had more than ample "footing in the realities of the subject" to justify enactment of the Smoking Bans. *Heller,* 509 U.S. at 321, 113 S.Ct. 2637. The Smoking Bans are the classic exercise of the well-recognized and far-reaching police power of the state over the health and welfare of its citizens.[31] *See Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *DeCanas v. Bica,* 424 U.S. 351, 356, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976).

Similarly, as discussed in the Court's equal protection analysis above, the mere fact that the Smoking Bans single out and place burdens on smokers as a group does not, by itself, offend the Equal Protection Clause because there is no fundamental right implicated nor is there a basis upon which to grant smokers the status of a protected class. Thus, CLASH's equal protection challenge fails under the rational basis standard of review. As the Supreme Court explained:

> The general rule is that legislation is presumed valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.... When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, ... and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic process.

*Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249 (citations omitted). Because the record is replete with data upon which the legislators could have rationally relied upon in enacting the Smoking Bans, the Court rejects CLASH's equal protection claim. *See Harris v. McRae,* 448 U.S. 297, 322, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) ("It is well settled that where a statutory classification does not itself impinge on a right or liberty protected by the Constitution, the validity of [the] classification must be sustained unless the classification rests on grounds wholly irrelevant to the achievement of [any legitimate governmental] objective.") (internal quotations and citations omitted). And it is not the province of this Court to second-guess such legislative choices. *See Beach Communications,* 508 U.S. at 313, 113 S.Ct. 2096 ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.").

Whatever respect Stewart may be due for the scope of her effort, the Court must question whether she possesses sufficient competency to attest to all of these matters, many of which were determined by trained professionals and high-ranking government officials whose scientific and professional credentials and experience are indisputable. Stewart, as a free-lance writer and journalist, is hardly qualified to opine on matters pertaining to the reliabil-

---

**31.** As the Supreme Court stated over a hundred years ago, the state's police power can extend to an outright prohibition of cigarette sales. *See Austin v. Tennessee,* 179 U.S. 343, 348–49, 21 S.Ct. 132, 45 L.Ed. 224 (1900).

ity and accuracy of scientific ETS research.[32] Moreover, Stewart's personal knowledge of events, in particular with regard to the legislative process behind the enactment of the Smoking Bans, has not been established, which further undermines the probative value of her testimony. *See* Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, ... and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

Notwithstanding these evidentiary obstacles to much of CLASH's motion papers, the Court acknowledges that some of CLASH's submissions may support its argument that the widely-accepted belief that ETS is harmful may not enjoy unanimous support in the scientific and medical community. Nor is every finding that ETS poses health risks immune from legitimate questioning and criticism. Indeed, the Court cannot rule as a matter of law that the various reports and studies CLASH submits to support its contention that ETS is not materially harmful to non-smokers are wholly without merit or are not sufficiently credible. Conceivably, all of CLASH's documentation, were it on the record as admissible evidence, might be relevant under a strict scrutiny standard.

Under a rational basis standard, however, the fatal premise in CLASH's attempt to discredit this data is that it requires the Court to accept in toto CLASH's cited research and studies on ETS in place of all the contrary research that has accumulated since 1986, and which comes by way of well-respected sources and endorsed by high-ranking government officials and other renowned authorities. While it is certainly in the realm of possibilities that other authority may reach a different conclusion, or at minimum take reasonable issue with some of the research Defendants rely upon, it does not render irrational Defendants' decision to rely on one body of relevant evidence over another.

For this reason, CLASH's attempts to discredit particular scientific evidence regarding ETS that Defendants cite are unpersuasive. With regard to the 1992 EPA Report, CLASH relies upon Judge William L. Osteen's decision in *Flue–Cured Tobacco Cooperative Stabilzation Corp. v. U.S. EPA,* 4 F.Supp.2d 435 (M.D.N.C.1998) *vacated and remanded,* 313 F.3d 852 (4th Cir.2002). In *Flue–Cured Tobacco,* a group of tobacco companies alleged, *inter alia,* that the EPA exceeded its authority under the Radon Research Act, 42 U.S.C. §§ 7401 *et seq.* (the "Act"), when it issued the 1992 EPA Report and that the EPA's risk assessment of ETS was not a result of reasoned decision making. *See id.* at 438–39. In an exhaustive opinion, the Court in *Flue–Cured Tobacco* granted the plaintiffs' motion for partial summary judgment after setting forth a detailed and scathing criticism of the 1992 EPA Report. Specifically, the Court concluded that with the 1992 EPA Report, the EPA: (1) violated the Act's procedural requirements; (2)

---

**32.** To the extent Stewart relies upon third-party research, reports, articles, and conclusions regarding ETS, such materials would likely be inadmissible hearsay at a trial if introduced by CLASH through Stewart, and accordingly, are not proper evidence for consideration on a motion for summary judgment. *See* Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits ... shall set forth facts as would be admissible in evidence, ....."). The materials cited in Gasior's and Bauer's affidavits do not suffer from the same infirmity because the State Defendants need only proffer them to show what materials they relied upon in enacting Chapter 13, and not for the truth of what is contained in those materials. Furthermore, a fair reading of Bauer's affidavit indicates that it is more akin to a reporting of findings and methodologies and not a comment on their merit, which Stewart clearly seeks to discredit.

publicly committed to a conclusion before research had begun; (3) adjusted established procedures and scientific norms to validate its conclusions; and (4) established a de facto regulatory scheme intended to influence public opinion. *See id.* at 465–66. The *Flue–Cured Tobacco* Court also concluded that the EPA's risk assessment was flawed. *See id.* at 466.

Judge Osteen's criticism of the 1992 EPA Report in *Flue–Cured Tobacco* does not alter the reasoning in this case. As discussed above, the record is replete with other scientific evidence that Defendants could have rationally relied upon in enacting the Smoking Bans. Thus, the fact that one report has been seriously called into doubt does not change the Court's analysis herein. Moreover, because a legislative choice may be sustainable even if it is based on "rational speculation unsupported by evidence or empirical data," *Heller,* 509 U.S. at 320, 113 S.Ct. 2637, CLASH's constitutional challenges would likely fail even if the 1992 EPA Report were the only source of empirical data Defendants cited in support of the Smoking Bans.

In this case, the record makes clear that Defendants have gone well beyond mere unsupported rational speculation. The intent behind the Smoking Bans finds immense support from empirical data and other evidence and therefore, the Court finds that Defendants have well surpassed the minimal requirement to satisfy the rational basis standard.

The Second Circuit in *Beatie v. City of New York,* 123 F.3d 707 (2d Cir.1997), addressed the pertinent considerations governing the rational basis standard in a case factually similar to this one. In *Beatie,* a cigar aficionado brought a substantive due process challenge to the pre-Local Law 47 version of the SFAA as it pertained to cigars. Specifically, the plaintiff argued that while scientific evidence suggested that ETS from cigarette smoke was harmful, there was no evidence that ETS from cigar smoke was likewise harmful. *See id.* at 709. The *Beatie* Court flatly rejected such a contention and found that under the highly-deferential rational basis level of review, the ETS evidence fully supported the legislature's desire to protect non-smokers from cigar smoke. *See id.* at 712–13. The same result is warranted here.[33]

CLASH casts the enactment of the Smoking Bans as a "knee jerk" reaction by the New York State Legislature and New York City Council based on one or two novel and specious scientific reports. According to CLASH, the government interest at issue here is based on a false premise because the allegations of the "purported lethal impact of secondhand smoke[ ] have no scientific basis whatsoever." (Pl. Mem. at 15.) CLASH alleges the enactment of the Smoking Bans was based upon "false, misleading, and dubious quasi-scientific studies and methodologies which greatly exaggerate the extent of the public and workplace risks of secondhand smoke . . . ." (Amd. Compl. at ¶ 58.)

Quite to the contrary, the evidence in the record before the Court makes clear that smoking prohibitions contained in the Smoking Bans are but the latest development of what has been an evolution of

---

**33.** Clash attempts to distinguish *Beatie* and other cases by pointing out that the plaintiffs in those cases did not argue for a heightened level of review as CLASH does here. (*See* Pl. Reply at 8–9.) This distinction, however, is not germane to the question of which level of review must be employed. The appropriate level of scrutiny is determined upon review of the governmental action, its purpose, and the nature of the constitutional rights, if any, that are implicated. The decision to employ a heightened level of scrutiny thus does not turn on whether the party challenging the statute requested such review.

smoking regulation prompted by scientific research confirming over the past 20 years or so that ETS poses potential health risks to non-smokers. In enacting the Smoking Bans, the New York State Legislature and New York City Council were not writing on a clean slate. The findings that ETS poses serious health risks are now well-documented from numerous independent sources. CLASH and its members can hardly be surprised by the progression of smoking restrictions. In fact, when the original CIAA and SFAA were enacted in 1989 and 1995 respectively, they could just as rationally have been extended to bars and restaurants as they were to other public places when these laws were adopted at that time.

Moreover, the justification for smoking in a bar or restaurant is not materially different from that which pertains to offices, theaters, libraries, retail stores and other public places that were already covered prior to the enactment of the Smoking Bans. Conversely, there is nothing about a bar or a restaurant that makes ETS any less harmful to persons affected by it, and an outright prohibition on smoking there any less compelling. In other words, there is no inherent quality in bars and restaurants that offer some protective shield from ETS that other public places do not have. Indeed, in light of the greater incidence and amount of smoking that has traditionally occurred in bars and restaurants when compared to other places where smoking is prohibited, it is a wonder that the contrary argument has not been advanced, namely, that the prior versions of these laws were flawed insofar as they exempted some of the places where arguably the greatest risks may have existed.

CLASH's fixation with discrediting both the particular reports that Defendants relied upon and the particular quoted death tolls quoted misapprehends the rational basis standard. It is of no consequence under rational basis review whether there were serious statistical flaws in the 1986 Report or the 1992 EPA Report; or whether the annual number of deaths attributable to ETS may actually be substantially less than the 63,000 figure cited in these reports. What is relevant for the purposes of the instant motion is that Defendants have persuasively demonstrated that there is a plethora of reliable and consistent evidence, upon which they relied in adopting the Smoking Bans, which concludes that ETS poses health risks to non-smokers. This body of evidence provides more than a sufficient rational basis to justify their enactments. As the Second Circuit explained in *Beatie* with regard to cigar smoke:

> At best, plaintiff's evidence suggests a lack of direct empirical support for the assumption that cigar smoke is as harmful as cigarette smoke or his evidence might demonstrate the existence of a scientific dispute over the risks in question. . . .
>
> Contrary to plaintiff's arguments, *due process does not require a legislative body to await concrete proof of reasonable but unproven assumptions before acting to safeguard the health of its citizens.* Thus, although the parties dispute the existence of and weight of direct scientific proof of cigar smoke's dangers, that dispute is not a material issue of fact in considering whether to grant summary judgment.

*Beatie*, 123 F.3d at 713 (emphasis added). Although *Beatie* dealt with a due process claim, the same rationale applies here. Even granting CLASH the benefit of the doubt that despite approximately 20 years of scientific findings to the contrary, there still exists a serious dispute over whether ETS is in fact harmful, such dispute does not affect the Court's holding that as a

matter of law, the Smoking Bans satisfy the rational basis test.

For the same reasons, CLASH's argument that the rationale for the Smoking Bans can be met with less-restrictive alternatives also misses the mark. Under the rational basis standard, such considerations are not relevant. "We will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, . . . because the problem could have been better addressed in some other way, . . . or because the statute's classifications lack razor-sharp precision, . . . ." *Beatie*, 123 F.3d at 712 (citations omitted). It is sufficient "that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id.* at 711 (quoting *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955)).

Indeed, the Court notes, borrowing from other applications of the law, that the Supreme Court has held that forcing a prisoner to share a jail cell with a smoker against his wishes can rise to the level of cruel and unusual punishment in violation of the Eighth Amendment, even if the non-smoking prisoner has yet to develop any medical conditions. *See Helling v. McKinney*, 509 U.S. 25, 31–35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Various Circuit Courts of Appeals also have discussed the well-documented harmful effects of ETS in similar contexts. *See, e.g., Atkinson v. Taylor*, 316 F.3d 257 (3d Cir.2003); *Davis v. New York*, 316 F.3d 93 (2d Cir.2002); *Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001); *Warren v. Keane*, 196 F.3d 330 (2d Cir.1999); *Rochon v. City of Angola*, 122 F.3d 319 (5th Cir.1997); *McKinney v. Anderson*, 959 F.2d 853 (9th Cir.1992), *aff'd and remanded sub nom. Helling v. McKinney*, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). In citing to these precedents, it is not the Court's intent to equate a prison inmate with a bar patron or employee.[34] However, these cases, many of which discuss the well-known harmful effects of ETS, illustrate the extent to which other authoritative matters of public record available to the legislators form the overall basis upon which, in enacting the Smoking Bans, they could rationally have concluded that ETS is a hazard to human health. Even Philip Morris, one of the largest cigarette manufacturers in the world, now publicly concedes that the results of ETS research support the passage of smoking prohibitions in public places. (*See* Gasior Aff. at Ex. 2.)

The Court's application of a rational basis standard of review to the Smoking Bans is consistent with other New York federal and state courts that have reviewed the constitutionality of smoking restrictions.[35] *See, e.g., Dutchess/Putnam Rest. & Tavern Ass'n, Inc. v. Putnam County Dep't of Health*, 178 F.Supp.2d 396, 405–06 (S.D.N.Y.2001) (rejecting plaintiff's equal protection and free speech challenges to the county board's anti-smoking regulations); *Justiana v. Niagara County Dep't of Health*, 45 F.Supp.2d

---

**34.** CLASH argues that bar or restaurant employees are not "indentured servants" and may find another job if dissatisfied with the air quality while working. (Pl. Reply at 10.) For that matter, why not ask an asbestos abatement worker to quit his job if his employer decides not to provide respiratory protection on the job? The Court agrees with

Frieden that no worker should be asked to choose between his job and his health.

**35.** The Tenth Circuit applied rational basis review to uphold a city regulation that prohibited smoking by first-year firefighter trainees in all places and at all times. *See Grusendorf v. Oklahoma City*, 816 F.2d 539, 541–43 (10th Cir.1987).

236, 242–43 (W.D.N.Y.1999) (holding that it was not irrational to enact legislation to protect against ETS in a piecemeal fashion); *Sayville Inn 1888 Corp. v. County of Suffolk,* No. 98–CV–4527, 1998 WL 34202846, at *2 (E.D.N.Y. Aug. 3, 1998), 1998 U.S. Dist. LEXIS 23472, at *6 (applying rational basis review in the context of a preliminary injunction to determine the plaintiffs' likelihood of success on the merits of their equal protection challenge); *Fagan v. Axelrod,* 146 Misc.2d 286, 550 N.Y.S.2d 552, 556–59 (1990) (rejecting plaintiffs' constitutional challenges to the 1989 CIAA under a rational basis standard).

Indeed, as is evident from the discussion above, the evidence against ETS is consistent, profound, and widely-accepted. Through the prism of a rational basis standard, CLASH's attempt to cast serious doubt on the mountainous evidence over the past two decades that has demonstrated that ETS poses health hazards is a hurdle that it simply cannot overcome with the materials it has marshalled here. It is akin to trying to scale Mount Everest with a ball of string.

In sum, while it is true that, as CLASH suggests, the Smoking Bans figuratively and literally leave smokers "out in the cold," CLASH has failed to demonstrate that the enactment of the Smoking Bans was not rationally related to some legitimate governmental purpose. The Court finds that the New York State and City legislators had a rational basis to enact the Smoking Bans, and such enactments were a valid exercise of the State's police powers over the health and welfare of its citizens. Accordingly, the Court rejects all of the claims in CLASH's amended complaint and grants summary judgment in favor of Defendants.

## G. *DISCOVERY*

As a final procedural note, the Court recognizes that although it is granting summary judgment to Defendants, the parties have not engaged in discovery. The general rule is that a Court should permit parties an adequate opportunity to engage in full discovery before considering summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 (2d Cir. 1983). Furthermore, the Court *sua sponte* has converted the Municipal Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) into a motion for summary judgment under Rule 56. In these circumstances, the Court must ensure that the party against whom summary judgment is entered had adequate notice of the materials relied upon by the opposing side and an opportunity to present its own submissions to defeat summary judgment. *See Pugh v. Goord,* 345 F.3d 121, 124–25 (2d Cir.2003) ("A *sua sponte* award of summary judgment may well be appropriate if it is clear that all of the evidentiary material a party might submit is before the court and no material issue of fact exists.") (citation omitted). Thus, it would be unfair to consider summary judgment if the losing party would be taken by surprise.

In its memoranda to this Court, CLASH informally requests discovery on the issue of the lethal effects of ETS. (*See* Pl. Reply at 5.) At a conference before the Court held on January 30, 2004, counsel for CLASH also suggested that he would like to depose the legislators responsible for enacting the Smoking Bans to determine what they considered. At oral argument before the Court, counsel for CLASH again requested further discovery on the "lethality" of ETS.

■ In this case, the Court finds that consideration of summary judgment against CLASH is proper. First, CLASH has responded to the State Defendants' motion for summary judgment with its own cross-motion for summary judgment, thus tacitly conceding that the record is complete for proper resolution of all the issues presented. *See Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283, 286 (2d Cir.2000) (affirming the district court's grant of summary judgment with no discovery when plaintiff had made its own motion for summary judgment). Moreover, it is clear that CLASH cannot claim unfair surprise because it has had the opportunity to respond to the submissions of Defendants, as shown by CLASH's competing evidence and arguments tending to refute Defendants' submissions pertaining to both ETS research and the enactment of the Smoking Bans. (*See* Pl. Mem. at 15–17; Mulhearn Aff. at Exs. B–Q; Stewart Aff. at ¶¶ 4–53.)

At oral argument, counsel for CLASH cited the decision in *Latino Officers Association v. City of New York*, No. 97 Civ. 1384 (KMW), 1998 WL 80150 (S.D.N.Y. Feb. 25, 1998), in an attempt to defeat Defendants' motions to dismiss the amended complaint. In *Latino Officers*, the Court held that the plaintiffs had alleged sufficient facts to support their claims under the First and Fourteenth Amendments. *See id.* at *3–*6. Thus, the question in *Latino Officers* was whether the allegations in plaintiffs' complaint established a claim upon which relief could be granted. Because the Court in this case is not considering Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), but rather, is granting summary judgment pursuant to Rule 56 based on the evidence in the record, the question of whether CLASH has sufficiently pled facts to establish constitutional violations and defeat a motion to dismiss is moot.[36]

Finally, the Court rejects CLASH's request for additional discovery on the potential lethal effects of ETS. Further evidence on this question would not affect the Court's analysis or conclusions. In light of the Court's ruling that, as a matter of law, the Smoking Bans need only satisfy a rational basis standard of review; and in light of the overwhelming and widely-accepted evidence in the record that the legislators considered in passing these laws, the Court is persuaded that any additional evidence that CLASH would adduce through discovery aimed at disproving Defendants' evidence on the harmful effects of ETS would fail to rebut the strong presumption of validity that attaches to the Smoking Bans. As discussed above, under a rational basis standard, the legislators are free to select which body of evidence to rely upon. In the words of Justice White, "it is the very admission that the facts are arguable that immunizes from constitutional attack the [legislative] judgment represented by this statute." *Vance*, 440 U.S. at 112, 99 S.Ct. 939; *see also Powers v. McGuigan*, 769 F.2d 72, 76 (2d Cir.1985) ("[W]here the discovery sought would not meet the issue that the moving party contends contains no genuine issue of fact, it is not an abuse of discretion to decide the motion for summary judgment without granting discovery."). Because Defendants have made more than an ample showing under the rational basis standard, additional scientific evidence to

---

**36.** To the extent CLASH seeks a favorable comparison between smokers and the plaintiffs in *Latino Officers*, the comparison fails for the same reason it does with *Fighting Finest*, namely, persons smoking in a bar or restaurant do not comprise an organized group of individuals with a common goal, theme, or message as do the groups in these two cases.

the contrary would not alter the Court's conclusion that the Smoking Bans are constitutional.

For the same reason, deposition testimony on what the State and City legislators considered in enacting the Smoking Bans would add nothing relevant to the record before the Court. The record already contains sufficient information upon which the Court determined that the Smoking Bans are rationally related to a legitimate state interest. Thus, additional evidence tending to refute specifically what the legislators considered would be of no consequence.[37] Accordingly, the Court finds that no prejudice to CLASH would result from the grant of summary judgment to Defendants without the benefit of discovery on this issue.

### III. ORDER

For the reasons discussed above, it is hereby

ORDERED that the motion of defendants City of New York and Thomas R. Frieden (the "Municipal Defendants") pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended complaint of plaintiff NYC C.L.A.S.H., Inc. ("CLASH") in its entirety is converted into a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and as such is GRANTED; it is further

ORDERED that the motions of defendants Eliot Spitzer and Antonia C. Novello (the "State Defendants") for summary judgment on all the claims in CLASH's amended complaint is GRANTED; and it is further

ORDERED that the cross-motion of CLASH for summary judgment is DENIED.

SO ORDERED.

---

37. Moreover, a party seeking additional discovery beyond affidavits to defeat a motion for summary judgment is required to file a formal affidavit pursuant to Federal Rule of Civil Procedure 56(f) setting forth (1) the particular facts sought; (2) how these facts would reasonably be expected to create a genuine issue of material fact; (3) efforts made to obtain these facts; and (4) why the affiant was unsuccessful in obtaining them. See Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir.1999) (citations omitted). CLASH's failure to file such an affidavit provides an additional basis for the Court's consideration of summary judgment against CLASH without discovery. See id. at 43–44 ("[T]he failure to file [a Rule 56(f)] affidavit ... is fatal to a claim [for discovery] ... even if the party resisting the motion for summary judgment alluded to a claimed need for discovery in a memorandum of law.") (citing Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir.1994)).